Good morning. Thank you for the opportunity to appear here this morning. My name is Eric Seitz. I represent the plaintiffs' appellants in this matter. Unlike virtually all of the cases cited and relied upon by Allstate, in this case, both the insureds and the insurance company acted irresponsibly, and neither party should benefit or enjoy a windfall or be unjustly enriched in a situation where both parties arguably were at fault. On advice of their counsel at that time, my clients failed to produce relevant and material documents and records and to complete their examinations under oath. That is true. On the other hand, Allstate refused to produce a copy of Ms. Deguchi's initial statement, caused Mr. Scalise to travel from the mainland to Hilo for a scheduled examination, which had been canceled because of Allstate's lawyer being on vacation, and demanded that the clients then be available for two days of examination each in Las Vegas, which would have necessitated an expense of somewhere between $20,000 to $30,000 for their attorney from Honolulu to fly and spend a total of five or six days in these examinations in a case that wasn't that complicated. All of that was exceptionally unreasonable on the part of Allstate. It was at that point that Mr. Ashford, who was counsel for the insureds, became very upset, and the process broke down, and he filed the lawsuit, the bad faith lawsuit, which he did. But again, I want to emphasize that this is a unique case where both parties contributed to that breakdown. Well, even if that's true, we just accept that, and bad blood between insureds and insurance companies seems to be a way of life to some degree because they have opposing interests in coverage. But don't we get to the fundamental question as to whether your client can refuse to answer questions about their financial situation, and that is essentially a breach of their agreement? No, you don't need to get to that point because I'm conceding it. And then why is that not all the further we need to get? Why don't you explain why you think we need to go further? Precisely. We've cited to you several cases in which there have been breaches, some as significant as these, where the courts have not merely dismissed the claims and allowed the insurance company to avoid liability altogether, but where the court has issued an order saying that we will afford you an opportunity to go back and remedy what has transpired. And I appreciate those cases. They kind of give you a do-over proposition. But the question I have is do you have any cases where a court of appeals actually reversed a district court for not providing that kind of opportunity? Well, if you look at the Powell case that we cited, which is a Fourth Circuit case, it's unclear from that case what the ultimate remedy was, but the case was remanded for the district court to determine in that situation what should take place next and whether or not there should be further inquiry. That's the only one I can find. The others are all trial court determinations on motions as far as the court. that a district judge facing this kind of situation where the company apparently, with justifiable reason, asks for financial information, and at least initially the insureds refuse, that when it gets to court, they say we've changed our mind, we're willing to give that information up, that a trial judge in that situation is required to conditionally deny some judgment to the insurance company? It is my position that that is exactly what should take place if... Your position is that should be mandatory. If the insurance company contributed to the breakdown of the relationship. Otherwise, if it's a question of whether or not one party or another acted reasonably, then that is a, and we've cited you some cases, that's a fact issue which ought to be tried. But where you have a record where both parties have acted unreasonably and that unreasonableness has contributed to the breakdown, then yes, it is incumbent, I believe, on the court to allow the parties to go back and try to complete the process under guidance, under the appropriate order. You can grant the motion for summary judgment without prejudice, and dismiss the case without prejudice, subject to conditions, and thereafter if those conditions are not adhered to, you can grant it with prejudice. Now what's the language in Powell that you say supports your argument in this regard? The language is essentially, it says we agree with the district court. I'm on page four. This is a Lexis decision now. Let me see if I can find, it's 274 of the court's opinion, I believe. Okay. Okay, got it. All right, so basically it says we agree with the district court that the Virginia courts would read the examination under oath language broadly enough to encompass financial motivations for suspected fraudulent conduct. That is like this case, and we concur. All right, but what in there says that the district, that the court should allow a dual? Oh, let me suggest, I'm sorry, I misspoke. What happened in that case was that there was simply a bad faith claim that was on appeal. And so what they basically did was affirmed the summary judgment on the bad faith claim. But there is, at least by implication in this case, and that's as close as I can get on an appellate court level, by implication there were no claims and there was no summary judgment that denied the claim altogether. All there was in this case were bad faith claims. And I'm not objecting to summary judgment being granted with respect to our case as to the bad faith claims that were brought. I think that was appropriate. So actually there is no language in there that suggests that there should be a do-over opportunity. Right, I'm interpreting that case to say that it only involved the bad faith claims. And what I'm suggesting is that the action that was taken there leaves open on appeal, when it was remanded, the possibility that the parties would be allowed to continue to pursue the process of the claims. Because the district court cited Powell to support its finding that it was appropriate to have the examination under oath to investigate possible financial basis for fraud. And I agree with that. And I agree. But, again, you have a situation here where, first of all, the clients didn't just refuse to cooperate, like some of the cases which the insurance company cites. This was a case in which they met. Ms. DiGucci was examined for four hours. Mr. Scalas flew there for his examination. But there were obvious failures to produce documents. And then there was this gross demand, which I think was vastly unreasonable, that they set aside two full days each to be examined under oath. Yeah, but, you know, that's kind of counseled back and forth. But the bottom line is that they didn't want to answer questions about their finances. And we have this vote that, at least somewhere in the documents, is suggested disappeared under suspicious circumstances, at least circumstances that can't be verified. And the insurance company kind of wants to know, well, why did you buy the vote? What are your finances? What's your situation at the time? That's pretty basic information that they don't want to answer. And I concede that that information is information to which they're entitled. I concede that. So it's a very odd thing. So this is they change attorneys. They ask them this information. Your clients refuse to provide it. And then your clients file suit against the insurance company. Should not have been done. It should not have been done. The problem is that the district court, when the district court, when he sees the case, that's what he sees. He sees your client suing the insurance company, but these are the same clients that won't answer the basic questions. So if I get your argument, which I think I can understand why you're making it, but you basically would like us to say that the district court somehow abused its discretion and not saying, okay, go back and now answer these questions. Exactly. And, again, the first prong of that is. Is there anything between October 2006 and now that prevented your clients from providing this information to the insurance company? Well, again, this is outside the record, but we offered to do that. I'm just asking if there was anything structurally that prevented it. No, there wasn't. We offered to. Well, I don't want to know outside the record. But that's, again. I only want to know what's on the record for the district court. Sure. And, again, you're looking at a case here now where, for example, the insurance company says that there were financial issues because there was some question about whether these people could continue to pay for the boat. But then you have in the record information that shows that they did pay off the mortgage. You have information that says that Ms. DiGucci sold off assets, and they obviously had assets. They just didn't have a good income flow. There were certainly enough to raise suspicions on the part of the insurance company, and we concede that. But in a case where there were mere suspicions and no actual evidence of any fraud, to take the claim away altogether because there was this animosity that arose to which the insurance company committed or contributed is, in our view, inviting insurance companies to engage in this kind of conduct as much as it is encouraging individuals to hold back information which the insurance company is entitled to receive. Are you the third lawyer on this case? Yes. And I don't justify either party acting the way they did. The problem here is, is it of such a nature that all state gets a $200,000 windfall, and I don't think that's just. And that is really the essence of our case in a state which has not decided those issues because the state of the law is the one Hawaii case which has been cited to you, and in our view, in Hawaii, we believe that there would be a more humane approach to this if this were decided by the state courts. And that is the essence of our position. It is correct that when Scalise appeared at his examination under oath in October, he refused to answer questions like, when did you start looking for a boat, why did you pick this boat to buy, or what he did for a living. Is that correct? By that point, there was such animosity that, yes, you are correct, that basically Mr. Ashford, who represented him, was a feisty lawyer, a very prominent member of this bar who has just only recently died. Mr. Ashford was obviously suspicious that the insurance company was doing things that they should not have been entitled to do, and that is why those decisions were made. We regret that. But the question is, what should the consequence be where there were equally, I believe, acts of misconduct by the insurance company? The consequences of that should not fall entirely. Why don't we hear from the insurance company? And let me say, just if I may, before I sit down, I have no problem paying the attorney's fees and costs that were occasioned by this bad faith lawsuit that should not have been filed. Let me ask one last question. I want a yes or no answer. Did this case go to mediation in the Ninth Circuit? It did not. Thank you. Good morning, Your Honors. Kevin Sumida for the insurance company Allstate LE. Let me first say that I believe that the theory now propounded this morning is a brand-new one that has not been really discussed in the briefs. There is no evidence whatsoever of some kind of animosity between the parties. This is as much a figment of imagination as the allegation made in the opening brief that the questioning of Noguchi was, quote, argumentative, snide, sarcastic, and insulting. There is no evidence of that that was offered. We pointed out that the transcript in which counsel was representing Mr. Noguchi made no comment whatsoever. Mr. Noguchi made no comment whatsoever at the examination about any allegedly argumentative, snide, sarcastic, or insulting comments. When was the first time that anyone representing the insureds told Allstate, we'll provide the financial information you want? That's a tricky question only in this respect. At the examination of Ms. Noguchi, she brought a bunch of documents, which presumably included the financial information requested. We were not allowed to see it at the time. She promised to turn it over to a court reporter, but then the record shows that she did do so on the record, and then she never produced them, even though multiple requests were made in writing to both her, when she was not represented, and to her attorneys. I'm sure Mr. Seitz would say that that was under the influence of her evil prior lawyer. I would disagree. First of all, as the court rightfully points out, there were three attorneys involved. The first attorney was a man named Mr. Nishimura, who is on the neighbor island, and he is not quite the feisty attorney that Mr. Ashford might be accused of being, and he was asked to produce the information, and he never did, and then he bowed out, and then there was a time when the insureds were not represented by counsel. Prior to that, they were informed by two separate adjusters in the course of their investigation that you must cooperate under the policy. You must produce documents. You must submit for examination, and if you don't do that, you may jeopardize your policy benefits. What about by the time you got to district court? Is there anything in the record in district court where they agreed to provide this information? No. And the claim that there was animosity between the parties is completely unsupported by the record, and, in fact, there was no animosity. One of the prime elements which counsel now tries to create this claim of animosity was a request by Allstate that the examination be conducted in Las Vegas. The reason for that was because Allstate discovered that the plaintiffs had moved to Las Vegas, and so Allstate was willing to submit, to send its counsel up there at its own expense and at the convenience of the plaintiffs to complete the examination there. And then given the fact that what occurred in the first examination of Ms. Deguchi, and if you read the transcript, you can see that Ms. Deguchi was not constrained to answer only the questions presented. She would go on and on and on. So it was clear that the examination might take a little longer. That was for her. And then for Mr. Scalise, there was indication that Mr. Scalise did not speak English as a primary language, and so there was an anticipation that he might transfer the required, and so that would, again, lengthen the course of the examination. The bottom line is that the law is very clear in Hawaii. It's not at all unclear that the insured must submit to examination, and if they fail to do so, that their claim must be denied. It's an examination process. It's an important process for the purpose of insurance companies investigating and validating loss. And in this case, there was complete failure to cooperate despite reputed requests to do so. And I would urge the Court to carefully review the well-reasoned and thorough decision of the District Court, who I think looked at everything very carefully and so will. So is the answer to the question I first asked you today? I'm sorry. The question was, when was the first time that the insureds told Allstate they would produce the financial information it wanted to examine? You know, I believe I would make the same point that Mr. Seitz made. I think there might have been a discussion after the Court entered summary judgment about a do-over, but that would be about the best of it. I don't believe anything is on the record regarding that issue. Thank you. Just briefly on several points. First of all, I don't regard Mr. Ashford as the evil attorney. He was a dear friend and somebody we deeply respected, but he was very angry, and I think you can read that from the pleadings and the manner in which this case was handled, especially about him having to travel to Las Vegas at a cost that was enormous for two days of examinations for each party. Is that correct? That's where the insureds were? That's where they were, and we don't complain about them scheduling them in Las Vegas. What we complain about is that they wanted two days each, which would have incurred an expense, $20,000 to $30,000 of expense and fees. Was it true that there may have been a need for a translator? No, there wasn't any need for a translator. The man speaks excellent English. So that's the first thing. The second thing I want to say is that although the law in Hawaii is clear that, yes, these documents should have been provided, the scope of the exam and the reasonableness of a refusal to participate at any stage is not clear. All you have is the Barabin case. You don't have any other law in Hawaii that clarifies that. Well, if it's not clear, then don't you lose? If the district court exercised discretion in an area that's not clear, why don't you lose? Because if the question was reasonableness and there were contentions as to why things happened and what precipitated certain actions, those are fact issues that should have been tried. Whether each party or both parties acted reasonably or unreasonably were fact issues and not subject to summary judgment. In a situation where, as I am asserting, that both parties contributed to the breakdown. And lastly, let me say that it's not clear that these parties were unwilling to provide the financial information. Some of it was provided. You see it in the record. But the fact is that they were about to provide it on a couple of occasions and other events ensued. Is any of that in the record? Yes. What do you point to? Well, first of all, you have Mr. Scalise's scheduled examination that was supposed to take place in Hilo, for which he flew and came. And he had, as I understand it, was prepared to answer all the questions, but Allstate's lawyer was on vacation. And then you have the discussion of continuing those examinations in Las Vegas. And had they been handled more reasonably and said, we'll set aside a half a day or a day as opposed to two days each, which is two to three times what we allow at depositions in federal court, I think that there would have been a resolution of all of those questions because it certainly is clear that the documentation Allstate wanted was something they were entitled to and it was available. But how they would get it at that point when they were making the kinds of demands that they were making contributed to a breakdown. And I don't believe our clients should suffer the loss of their claim under those circumstances where they did cooperate to some degree, albeit not to the degree required by law. Thank you. Thank you both, counsel, for your argument this morning. Degucci v. Allstate Insurance Company is submitted. The next argument this morning is Craig Elmer Chapman v. Journal Concepts, Inc. Thank you.
judges: Hawkins, McKeown, Rawlinson